The Klingle Corporation v. Commissioner.
Klingle Corp. v. Commissioner
Docket No. 2241-68.
United States Tax Court
T.C. Memo 1970-135; 1970 Tax Ct. Memo LEXIS 226; 29 T.C.M. (CCH) 603; T.C.M. (RIA) 70135; June 1, 1970. Filed Allen M. Gardner and William A. Wildhack, Jr. 730 15th St., Washington, D.C., for the petitioner. Thomas C. Morrison, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioner's income tax for the calendar years 1964 and 1965 in the respective amounts of $607.74 and $12,095.16. After concessions made by petitioner, the only matter remaining in dispute relates to investment credit (totaling $11,846.47 in 1965) claimed with respect to the cost of converting four elevators from manual to automatic operation in petitioner's high rise apartment building. Findings of Fact Some of the facts are stipulated. The stipulation, and the exhibits attached thereto, are incorporated herein by this reference. The petitioner is a Delaware corporation with its principal office in Washington, D.C. It filed its corporation *228 federal income tax return for the calendar years 1964 and 1965 with the district director of internal revenue at Baltimore, Maryland. Since its incorporation in 1935, the petitioner has owned the Kennedy-Warren Apartments (hereinafter sometimes referred to as Kennedy-Warren), a high rise apartment building located on Connecticut Avenue at Klingle Road in Washington, D.C. Petitioner owns no other rental property. The Kennedy-Warren building was originally designed to have two wings and a center section, but was in fact constructed as one wing and a long center section. The wing, which is perpendicular to Connecticut Avenue, is met at its midpoint by the north end of the center section which is parallel to Connecticut Avenue. There is one passenger elevator located in the wing near the junction of the wing with the center 604 section. There are two passenger elevators, a service elevator, and a freight elevator at the middle of the center section. The number and location of the elevators and the floors which they serve are as follows: Elevator No.
Location
Floors Served
1
Lobby
B through 11
2
Lobby
B through 11
3 (Service)
Off Lobby
B-2 through 11
4 (Freight)
Off Lobby
B-2 through 11
5
Wing nearcentersection
B-3 through 11
*229 During 1965, the petitioner spent $169,235.33 in the "reconstruction" [1] of elevators 1, 2, 3 and 5. This "reconstruction" of the four passenger elevators represented conversion from manual to automatic operation and was undertaken in order to reduce labor costs and to increase the speed of the elevators. An investment credit was claimed in the amount of $11,846.47 for 1965 with respect to this expenditure. The cost of reconstruction and the claimed investment credit are allocable to these elevators in the following amounts: Elevator
Improvement Cost
Claimed Credit
1
$ 44,152.03
$ 3,090.64
2
37,990.23
2,659.32
3
41,652.03
2,915.64
5 45,441.04
3,180.87
Totals
$169,235.33
$11,846.47
The freight elevator (4) was not converted and is not in issue. The Kennedy-Warren has 317 apartments available for rental, varying in size from efficiencies to *230 three-bedroom apartments. Of the 317 apartments, 316 were rented at the time of the trial of this case; approximately 394 persons occupied the 316 apartments. Most of the tenants are over 65 years of age. A large number of these were widows. Approximately 285 persons occupy apartments in the wing; approximately 109 persons occupy apartments in the center section. Three additional apartments were occupied by employees. The front of the Kennedy-Warren (the street side) rises nine stories on the east side of Connecticut Avenue. At the back, facing Rock Creek Park, the Kennedy-Warren rises fifteen floors above the ground. The 15 floors include basement floors and eleven regular floors numbered from 1 to 11, inclusive. The 320 apartments are located on the following floors: Floor
Apartments Per Floor
B (basement)
3 (employees)
1
18
2
20
3 (street)
17
4
32
5-10
33 each
11
32
The basement floors are numbered as follows: B
First basement floor below floor 1
B1
Second basement floor below floor 1
B2
Third basement floor below floor 1
B3
Fourth basement floor below floor 1
The Kennedy-Warren also contains a restaurant facility, a ballroom, *231 two lounges, a newsstand, a beauty salon, and a threefloor underground garage. The restaurant, the two lounges, and the newsstand are on the third (street level) floor. The restaurant itself is somewhat lower than the third floor and is reached by a short flight of stairs descending from that floor. The dining room is approximately twice as far from elevators 1 and 2 as from elevator 5. The newsstand is approximately 50 percent farther from elevator 5 than from elevators 1 and 2. The lounges are located on either side of the lobby. The beauty salon and public rest rooms are on the second floor. In order to enter the ballroom it is necessary to descend 5 feet from the ballroom lounge which is 5 feet above the first floor and 5 feet below the second floor. The three-floor underground garage is entered by a ramp down from the street level to an entrance on the south end of the center section of the building. It contains 179 marked spaces available for monthly rental to tenants. The garage spaces on floors B1 and B2 are rented to tenants for $20.00 monthly. The garage spaces on floor 605 B are rented to tenants for $22.50 monthly. The number of marked spaces available and the number *232 of spaces currently rented to tenants for each floor of the garage are set out below: Floor
Spaces Available Per Floor
Spaces Rented Per Floor
B2
64
54
B1
76
66
B 39
35
Totals
179
155 There are approximately 24 unrented marked spaces. There are approximately 20 marked spaces which are rented by tenants who do not have cars; when these spaces are not being used by guests of the tenant-lessee they are made available to patrons of the commercial facilities in the Kennedy-Warren. In addition to the 179 marked spaces, there is an additional area on floor B reserved for free, non-tenant parking which will accommodate not more than 70 cars, but usually there was room for 100-110 cars. A part of this parking area, where there is easy access to the freight elevator, is used during the day by commercial vehicles for servicing facilities other than the restaurant, ballroom, beauty salon, and lounges. This unrented, free parking area is also used to park cars belonging to patrons of the commercial facilities in the Kennedy-Warren and cars belonging to tenant guests. There are about 50 tenant guests a day on an average. The Kennedy-Warren does not charge for non-tenant *233 usage of its parking facilities. Persons arriving at the Kennedy-Warren, other than tenants, usually stop on the B level and leave their car with an attendant and ride up on elevators 1 or 2. Often non-tenant cars will arrive with four to six persons who are patrons of the commercial facilities. Although parking is permitted along portions of the nearby public streets, it is very difficult to find a parking space. As a practical matter, a large number of the prospective patrons of the restaurant who cannot park in the garage go elsewhere, essentially those who are going out to dinner at night. However, the garage does not have to turn people away for lack of parking space more than once or twice a month. The restaurant, ballroom, and the two lounges adjoining the lobby are rented to an unrelated concessioner, Ann C. Brosius, for seven percent of the gross receipts. Without further charge, the Kennedy-Warren also provides all furnishings, utilities, and maintenance, except that the concessionaire provides her own janitorial services for the restaurant facility, ballroom, and one lounge. The Kennedy-Warren provides janitorial services for the other lounge. The Brosius concession *234 is a successful enterprise even though it does not advertise, does not display any signs, and does not have a separate telephone number for either its restaurant or party group activities. The gross receipts received by petitioner from the concession were as follows for the listed years: Year
Seven Percent Concession Income
1963
$22,847.61
1964
25,830.22
1965
24,666.21
1966
24,876.94 The newsstand is a leased concession for which the Kennedy-Warren receives a $65 monthly rental. The beauty salon is a leased concession for which the Kennedy-Warren receives $150 monthly. On its 1964 and 1965 income tax returns, petitioner reported total gross rental income in excess of $700,000 each year. For the year 1966, a representative year, the restaurant served 19,840 luncheon guests, 66,039 dinner guests, and 17,884 private party guests for a total of $103,763 persons of whom no more than one fourth were tenants or neighborhood people. Of the guests other than tenants or neighborhood people, 90 percent arrived by car, parked in the garage, and rode up to the ballroom, rest rooms and lobby in elevators 1 and 2. Most of the arrivals of guests by car are in groups of *235 four or five persons. The private party guests would often make two round trips on elevators 1 or 2 - one from and to the garage and one to and from the rest rooms. Many of the dining room guests also made two round trips. Elevators 1 and 2 were also used to show the facilities to prospective private customers and by the private party sponsors when they are decorating and preparing for the event. Neither the Brosius concession nor its patrons paid for the use of the elevators. The 285 tenants who live in or near the wing section of the building generally used elevator 5. The 109 tenants who live in the center section of the building generally used elevators 1 and 2, and sometimes elevator 3. Service people, such as maids, maintenance men, practical nurses and those making deliveries, made approximately 100 one-way trips per day. Most of those persons used elevator 3, since service people are in 606 general prohibited from using elevators 1, 2 and 5. Tenants who lived in the wing section might use elevators 1, 2, and possibly 3 if they went to get their mail, to the lounge, or to the front of the building to get a taxi. Tenants who lived in the center section would use elevator *236 5, and possibly elevator 3 if their cars were parked in a marked space in a subbasement. Normally a number of the apartments would be temporarily unoccupied because the tenants were on vacation or visiting relatives. The 394 tenants of the Kennedy-Warren apartments made, on an average, no more than two round trips on the elevators per day. In the year 1965, a greater number of outside patrons and employees of the commercial concessions were carried on elevators 1 and 2 than the number of tenants, their guests and the employees of the Kennedy-Warren. The record does not disclose the number of ascents and descents of these elevators required in the movement of these categories of the persons using the elevators. Nor does it disclose the duration of time or extent of distance traveled required in the movement of each category of such persons. Opinion KERN, Judge: The deficiency here in issue stems from the fact that respondent has disallowed investment credit claimed by petitioner with respect to amounts expended by it in 1965 on the conversion of the four elevators, described in our Findings of Fact, from manual to automatic operation. Respondent's basic position is that these *237 elevators did not constitute section 38 property since they were "property which is used predominantly to furnish lodging or in connection with the furnishing of lodging" within the meaning of subsection 48(a)(3), I.R.C. 1954. [2] That subsection reads as follows: SEC. 48. DEFINITIONS; SPECIAL RULES. (a) Section 38 Property. - * * * (3) Property used for lodging. - Property which is used predominantly to furnish lodging or in connection with the furnishing of lodging shall not be treated as section 38 property. The preceding sentence shall not apply to - (A) nonlodging commercial facilities which are available to persons not using the lodging facilities on the same basis as they are available to persons using the lodging facilities, and (B) property used by a hotel or motel in connection with the trade or business of furnishing lodging where the predominant portion of the accommodations is used by transients. Petitioner advances two contentions in opposition to respondent's determination, one to the effect that all four *238 elevators were section 38 property and the other, in the alternative, that two of the elevators (Nos. 1 and 2) were section 38 property. Petitioner's first contention rests in large part on the addition of subsection (C) to section 48(a)(1) by an amendment to that section enacted subsequent to the enactment of the investment credit provisions of the Revenue Act of 1962 which included section 48(a)(1)(A) and (B) and also section 48 (a)(3). Section 48(a)(1) as thus amended defines "section 38 property," i.e., property eligible for the investment credit as follows: SEC. 48(a). Section 38 Property. - (1) In General. - Except as provided in this subsection, the term "section 38 property" means - (A) tangible personal property, or (B) other tangible property (not including a building and its structural components) but only if such property - (i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or (ii) constitutes a research or storage facility used in connection with any of the activities referred to in clause (i), or (C) elevators and escalators, *239 but only if - (i) the construction, reconstruction, or erection of the elevator or escalator is completed by the taxpayer after June 30, 1963, or (ii) the elevator or escalator is acquired after June 30, 1963, and the original use of such elevator or escalator commences with the taxpayer and commences after such date. Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 4 years or more. 607 Petitioner's argument in connection with this first contention may be paraphrased as follows: Section 48(a)(1) which defines "section 38 property" contained only subparagraphs (A) and (B) when the investment credit provisions were first added to the Internal Revenue Code by the Revenue Act of 1962 enacted October 16, 1962. Proposed Income Tax Reg. 1.48-1(e)(2), 28 Fed. Reg. at p. 3039 (May 28, 1963), construing that part of section 48(a)(1)(B) which provided that "a building and its structural components" should not be considered "section 38 property" as "other tangible property," stated that the term "structural *240 components" included "stairs, escalators and elevators." Section 48(a)(3), supra, dealing with "Property used for lodging" was a part of the original legislation of 1962 providing for investment credits. By section 203(c) of the Revenue Act of 1964, section 48(a)(1) of the Internal Revenue Code of 1954 was amended by the addition of subsection (C). Neither this subsection nor Income Tax Regs. 1.48-1(m) makes any reference to section 48(a)(3) providing that property used for lodging shall not be considered as section 48 property or to Income Tax Regs. 1.48-1(b). Petitioner argues from these circumstances that Congress did not intend that subsection 48(a)(1)(C) should be subject to the limitation of section 48(a)(3). The reason for the amendment providing for the addition of subsection 48(a)(3)(C) was the publication of the proposed income tax regulation referred to above. As stated in H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964-1 (Part 2) C.B. 159, this proposed Regulation was "an accurate interpretation of the intention of Congress last year in this respect" but the newly formed intention of Congress was that escalators and elevators should no longer *241 be ineligible for the investment credit as "structural components" of buildings but should be treated for purposes of the investment credit as "assets accessory to the operation" of a business such as "machinery, printing presses, transportation or office equipment, refrigerators, individual air-conditioning units, grocery counters, etc." and thus representing "an important aspect of modernization of plant and facilities." There is no reference to subsection 48(a)(3) in the legislative history of subsection 48(a) (1)(C) or in the regulations pertaining to this subsection promulgated after its enactment. There is implicit in petitioner's argument the basic contention that by reason of the legislative chronology stated above and the silence of Congress and Commissioner with regard to subsection 48(a)(3), Congress must have intended elevators and escalators to be specially immune from restrictions such as those contained in section 48(a)(3), which affect all other categories of property described in section 48(a)(1). As we have pointed out, the Congressional purpose motivating the enactment of section 48(a) (1)(C) was to set aside the "structural components" obstacle to the treatment *242 of elevators as section 38 property which was contained in the Treasury Department's proposed regulations of 1963 and to place elevators and escalators on an equal footing with other categories of property described in section 48(a)(1). H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964-1 (Part 2) C.B. 159-160. In our opinion, elevators and escalators are no more immune from restrictions such as those contained in section 48(a)(3) than are other categories of property described in section 48(a)(1). Petitioner also appears to argue that the investment credit should be allowed on the elevators "for the further reason that they are available to persons not using the lodging facilities on the same basis as they are available to persons using the lodging facilities," and therefore are to be considered as "a nonlodging commercial facility" not to be treated as property which is used predominantly in connection with the furnishing of lodging because of the provisions of Income Tax Regs. 1.48-1(h)(2)(i). This argument is without merit. From a reading of section 48(a)(3)(A) of the Code, section 1.48-1(h)(2)(i) of the Regulations in its entirety [3] and the legislative history of section *243 48(a)(3)(A), [4] it is apparent that Congress did not intend the phrase "non-lodging commercial facilities" to be the equivalent of property equally available for use in connection with both a lodging facility and a commercial facility. The phrase in section 48(a)(3)(A) "which are available to persons not using the lodging facilities on the same basis as they are 608 available to persons using the lodging facilities" was not intended to define "non-lodging commercial facilities" but was intended to modify and limit this latter phrase as used in this subsection of the Code. It is apparent that Congress intended section 48(a)(3)(A) to provide in a case such as the one before us that if a commercial facility, such as a restaurant or drugstore, were located in an apartment building, then the commercial facility itself (together with its component parts) was not to be considered property used "in connection with the furnishing of lodging" even if no one other than the tenants of the apartment building patronized the facility as long as the facility was available to persons other than tenants on the same basis as to the tenants. As to whether or not a property used in connection with *244 a non-lodging commercial facility (but not a component part thereof) and also used in connection with the furnishing of lodging, such as petitioner's elevators, is eligible for the investment credit, the statutory scheme requires the application of the predominantuse test of section 48(a)(3). We now reach petitioner's second and alternative contention. Petitioner contends that by virtue of the use made of elevators 1 and 2, these elevators (but not elevators 3 and 5) were eligible for the investment credit because they were not "used predominantly * * * in connection with the furnishings of lodging." Petitioner argues to the effect that even *245 though subsection 48(a)(1)(C) is subject to the limitation of subsection 48(a)(3) and even though an apartment house is a lodging facility (see Income Tax Regs. 1.48-1(h)(2)(ii)), elevators located in an apartment house and installed for the purpose of serving the occupants of the apartments do not constitute "property which is used predominantly * * * in connection with the furnishing of lodging" if the number of people using the elevators in connection with the operation of a restaurant and ballroom and an adjacent lounge room located in the apartment house building and operated by concessioners of its owner exceeds the number of people using the elevators in connection with the occupation of the apartments contained in the building. The phrase "used predominantly" has been given several definitions in the regulations. Income Tax Regs. 1.48-1(h)(2)(ii) which considers the question inherent in subsection 48(a)(3)(B) states that "if more than one-half of the living quarters of a hotel, motel, inn, or other similar establishment is used during the taxable year to accommodate tenants on a transient basis, none of the property used by such [establishment] * * * shall be considered *246 as property which is used predominantly to furnish lodging or predominantly in connection with the furnishing of lodging." In other words the question of what was to be considered as predominant use depended on the area of establishment used for the accommodation of transient tenants rather than the number of transients accommodated. Thus, if only two-fifths of the area of a residential hotel is devoted to the accommodation of transient tenants, it will be considered as property used predominantly to furnish lodging, even though the number of transient tenants accommodated during the year was four times the number of the non-transient tenants of the hotel. Income Tax Regs. 1.45-3(a)(4)(ii) indicates that in considering the problem of whether property is used predominantly in the business of selling gas through a local distribution system the controlling criterion is the time of such use. Thus, if an office machine is used 55 percent of the time for billing customers of the local distribution system it will be considered as used predominantly in the business of selling gas through a local distribution system regardless of how many other customers are billed by it during the other 45 *247 percent of the time of its use. Income Tax Regs. 1.48-3(g)(1)(i) which deals with property used predominantly outside the United States (section 48(a)(2)(A)) provides that "[if] the property is physically located outside the United States during more than 50 percent of the taxable year, such property shall be considered used predominantly outside the United States during that year." Thus a conveyor belt located outside the United States during over 50 percent of the taxable year would be considered as being used predominantly outside the United States regardless of the number of articles carried thereon as compared with the number of articles carried during the rest of the year. See, also, H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 517; S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 860. In one instance the character of property for purposes of depreciation has been determined by reference to the character of the income derived from the property. By 609 section 167(j)(2)(B) "residential rented property" is defined as a building 80 percent or more of the income from which is rental income from the dwelling units." We *248 have found no instance in the Internal Revenue Code or in the Regulations where the depreciation of property or the determination of the question of its predominant use has been made by reference to a head count of the persons using the property. The difficulties incident to the use of such a test or criterion are apparent under the facts of the instant case. Let us contrast two hypothetical instances involving the use of one of the elevators here involved. In one, 4 customers of the restaurant call the elevator, which has been stopped on the third floor, to descend to the basement and carry them to the third floor. In the other, a tenant of an apartment on the 11th floor calls the elevator, which has been stopped on the third floor, to ascend to the 11th floor and carry him from that floor to the basement. In both instances the area used, i.e. the elevator itself, is the same. However, the period of time during which the elevator is used and the distance traveled (which affects both the time of use and the power necessarily expended to achieve or regulate motion) are greater in the second instance involving the transportation of only one passenger. By our use of the phrase "head *249 count" in our description, supra, we do not mean to impute a high degree of accuracy to the estimates made by petitioner's witnesses as to the number of restaurant customers and patrons of the commercial concessions using elevators 1 and 2 on one hand and of the tenant residents of the apartment house and the guests and employees on the other. We consider these witnesses to be honest and competent. However, with the exception of the number of meals served by the restaurant during an annual period, the numbers of each category of persons using the elevators in question represented the opinions and estimates of these witnesses rather than any count and these opinions and estimates made no reference to the distance traveled, the time consumed or the power expended in connection with the use of the elevators by one category of persons as contrasted with another category. We think that the record justifies a conclusion that a greater number of persons who were patrons and employees of the restaurant and other commercial activities carried on in the apartment building used the elevators involved in this issue (Nos. 1 and 2) than the number of tenants of the apartment and their guests and *250 employees, although this conclusion is not free from doubt. However, we do not think that this ultimate fact, the only one favorable to petitioner's contention which we feel justified in finding, standing alone constitutes satisfactory proof, in the situation presented by the instant case, that the elevators here in question were not used predominantly in connection with the furnishing of lodging. Since it is our view that the burden of proof in this regard is on petitioner, we decide this issue in favor of respondent. Decision will be entered for the respondent. Footnotes
1. The use of the term "reconstruction" in the stipulation obviously reflects an agreement by the parties that if other investment credit provisions are satisfied, petitioner's expenditure would qualify as an amount paid for "new section 38 property" within the meaning of section 48(b), I.R.C. 1954↩.
2. Hereafter all section references are to the Internal Revenue Code of 1954 as in effect during the tax year in question, unless otherwise indicated.↩
3. Sec. 1.48-1(h)(2)(i)↩. A nonlodging commercial facility which is available to persons not using the lodging facility on the same basis as it is available to the tenants of the lodging facility shall not be treated as property which is used predominantly to furnish lodging or predominantly in connection with the furnishing of lodging. Examples of nonlodging commercial facilities include restaurants, drug stores, grocery stores, and vending machines located in a lodging facility. 4. 1962-3 C.B. at pp. 416, 722, 518-519↩.